# DAVID ZAPP

46 EAST 92ⁿᵈ STREET • SUITE 2 • NEW YORK, NEW YORK 10128
212-410-3351 • ESPAÑOL 212-410-2041 • FAX 917-492-1879

A T T O R N E Y

NEW YORK, DISTRICT OF COLUMBIA,  NEW JERSEY BARS

August 29,2013

Hon. J. Paul Oetken
United States District Court Judge
500 Pearl Street
New York, New York 10007

Re USA vs Slobodyansky 12 CR 171

Dear Judge Oetken,

This memorandum is submitted on behalf of **Dmitry Slobodyansky** ("**Dmitry**") who is to be sentenced by you on September 9, 2012 at 2:30 p.m. Dmitry pled guilty to an Information charging him with conspiracy to commit mail and health care fraud under 18 USC 371.

There are several minor errors in the Pre-Sentence Report ("PSR") that should be cleared up and one major point that we take issue with.

In paragraph 72, mention is made of a property that sold for 150,000 dollars. That is a typo. The property sold for the 775,000 as is mentioned in the subsequent paragraph, most of which if not all was paid to the bank. In paragraph 93, all outstanding New York state judgments were satisfied. The State may not have gotten around to filing the satisfactions of judgments. And in paragraph 92, shares that he sold to his father were for commercial property to be completed but not as yet completed.

The major point of contention is Paragraph 38 which did not appear in the preliminary PSR and was just received on August 28. In describing the various defendants' roles, the PSR notes that,

1

> *"DMITRY SLOBODYANSKY was a controller of multiple chiropractic clinics who directly paid kickbacks to the owners and controllers of no-fault clinics for each patient referral for which he was able to fraudulently bill insurance companies." P13, paragraph 38.*

If mutiple means the two clinics I know about, it is correct.

> *"**SLOBODYANSKY** was not a practitioner himself, .   .   ." P13, paragraph 38.*

Dmitry "was a practioner," a licensed chiropractor "As verified, on April 14, 1998 the defendant became licensed by the State of New York as a chiropractor, license #008950." Final PSR page 19, paragraph 85.

> *"  .   .   .but rather worked out arrangements including the aforementioned kickbacks, to place his own chiropractors in clinics to provide unnecessary and excessive medical treatment for which he could bill insurance companies." P13, paragraph 38.*

Dmitry did not have "his own" chiropractors. He was involved with another chiropractor who was going to be partners in a new clinic, Ocean and that partner, we believe, later became a cooperating individual. This is not said to reveal state secrets but rather to put the court on notice that most of the government's information with regard to the Ocean chiropractic clinic, and the substance of what is written in PSR paragraph 38 comes from that partner. Henceforth he will be only known as the "partner."

The client informs me that it was the partner the Clinic Controllers first approached about setting up a Chiropractic PC on Atlantic Avenue in Brooklyn. The Clinic Controllers wanted cash, though, not checks and the partner declined. It would be difficult to amass that much cash monthly especially before the insurance companies started paying. Time passed and the clinic controllers made the same pitch to Dmitry. Dmitry declined for the same reason

but proposed a 60-40 split with the chiropractic PC getting the 40%, and the clinic controllers agreeing largely because they could not get anyone to do it their way.

Then Dmitry approached the partner and asked if he wanted to run the Chiropractic Clinic PC as a partnership with a 50-50 split. Dmitry would get his share because he brought in the business, and the partner would run the day-to-day operations. The partner agreed. The partner set up the PC corporation, hired the staff, paid the bills and issued the checks including paying the 60 per cent and actually delivering the checks to the Clinic Controllers. More importantly he shared equally in the profits. This is not to say that Dmitry did not know what was going on. It is to say that this partner was a partner not someone on salary. The Ocean Corporation operated for approximately one year.

This case is most like the case of Pavel Poznansky ("Poznansky") who was sentenced by this Court on August 6, 2013 to nine months.  Poznansky was an acupuncturist who owned his own corporation and defrauded insurance companies of at least 399,000 dollars, and in exchange for his plea, he was given a "minor role" and his guideline score was not enhanced for using "sophisticated means" to pay off other members of the conspiracy although paying checks for "rent" rather than "kickbacks" is hardly "sophisticated."

Dmitry, exactly like Poznansky, was a professional, in his case, a chiropractor, who owned a corporation with his partner and defrauded the insurance companies of $494,000 dollars, 95,000 dollars more for unnecessary treatments. But he was not given "minor role" and his guideline score was enhanced for using sophisticated means to pay off other members of the conspiracy even though the method of payment was substantially the same as Poznansky's method of payment.

Like Poznansky, the partner and Dmitry were running their PCs. Like Poznansky they owned the PCs. Like Poznansky, they were partners not salaried employers. Like Poznansky they were committing the same kind of fraud. Like Poznansky they were paying kickbacks. Like Poznansky they were paying them substantially the same way.

> *"In order to pay the kickbacks to clinic controllers **SLOBODYANSKY** wrote checks disguised as "rent" checks for space in the no-fault clinics; paid bills for utilities*

*and other expenses, and wrote checks that*
*were cashed with check cashers in order to*
*generate cash." PSR page 13, Paragraph 38.*

According to Dmitry he did not issue the checks. The
partner did, as was his function, and if the partner
cashed checks with check cashers, he did it on his own.
That is not to say Dmitry did not know about these
payments but the paragraph should be accurate. It is no
coincidence that the existence of the partner is not
even acknowledged.

Below are portions of the sentencing minutes of
Poznansky' sentencing held on August 6, 2013, for the
Court's review. They are attached as well as an exhibit
for completeness. They confirm much of what is being
said here. To the extent there are differences, it is
submitted they are differences without much
distinction:

.   .   .

*THE COURT:  So what was his [Poznansky]*
*relation to the PC?*

*MS. TSEITLIN:  Well, he was the principal*
*in that PC.*

*THE COURT:  So he received a salary, or*
*did he receive a percentage of the*
*profits?*

*MS. TSEITLIN:  He received a salary from*
*his PC.  So his PC had paid him a salary.*

*THE COURT:  Okay.  Were there others that*
*he worked with?*

*MS. TSEITLIN:  He was the principal of --*
*no, he didn't work with anyone else.  It*
*was his PC.  He billed for the services*
*he rendered.*

THE COURT:  Okay. And there was no one
else he was working for or with at that
PC?

MS. TSEITLIN:  The PC, he worked in the
clinic.  He received -- he worked as an
acupuncturist.  He did have some
assistance from his billers or clerks in
his PC.

THE COURT:  Okay.

MS. TSEITLIN:  But he had not shared any
profits with the clinic.  He had not
received any kickbacks from the clinic,
and he had not participated in any kind
of conduct with the clinic, other than
being an acupuncturist in the clinic and
billing for the services that he
performed.

THE COURT:  Okay.

                *       *       *

MR. GOLDMAN: I'd like to respond to a
couple of points that Ms. Tseitlin made.
The first, and I think most relevant in
response to what your Honor was asking,
is that Mr. Poznansky incorporated Kali
Acupuncture, and he was the sole
shareholder of that PC.  So he did derive
the profits from it, unlike Mr. Greensher
who was a salaried employee for somebody
else.

In addition, Mr. Poznansky was the one
who facilitated the relationships with
the clinic owners and who, in the
ordinary course of things, would have

*given a share of his billings to the
clinic owners.*

*THE COURT:  Why do you say in the
ordinary course of things?*

*MR. GOLDMAN:  Well, that's how it worked.*

*THE COURT:  Why didn't it work in --*

*MR. GOLDMAN:  It did work, it did work
that way.*

*THE COURT:  Okay.*

*MR. GOLDMAN:  I'm saying this is how the
scheme worked.*

*THE COURT:  So explain to me how, in the
Government's view -- well, what the
relationship was between the PC, of which
he was the shareholder, and the rest of
the scheme.*

*MR. GOLDMAN:  Generally speaking, with
the acupunctures and chiropractor
clinics, it worked one of two ways.  The
most common way is that in return for
referring all of the patients, the no
fault clinic itself would receive a
percentage of the checks received by the
acupuncture and chiropractic clinics.  So
usually the split was 60 percent for the
clinic, the no fault clinic, 40 percent
for the acupuncture and chiropractor PC.
Okay.*

*THE COURT:  And in the case of Kali, were
these patients referred to --*

MR. GOLDMAN:  Frankly, our evidence is not clear as to Kali as to what the arrangement was.

THE COURT:  And this was not a fraudulent incorporated clinic.

MR. GOLDMAN:  No, it was not a fraudulent incorporated clinic.  This is based purely on the medical necessity.  When Mr. Poznansky incorporated it, he was a practicing acupuncturist there. But I think a key distinction is that, that regardless of whatever the arrangement was that allowed for Mr. Poznansky's clinic to have space in the no fault clinic and to receive patient referrals from the no fault clinic, he billed for his own work and he received all of the money that the insurance companies were paid for that work.  He was not a salaried employee.  So he did derive, directly derive, profits from his up coding and of his excessive treatments and excessive billing.  And I think that's a critical distinction,

THE COURT:  So in what way was this part of -- I mean, I can see how he's admitted to billing for services that were not provided, but how does this relate to the rest of the scheme where there were runners and referrals from the no fault clinics?  Is this just kind of its own little fraud that was going on?

MR. GOLDMAN:  No.  What happens is there's a sort of brick and mortar no fault clinic, okay, that, you know, was the wood.(sic) The controllers of those clinics would pay runners to get -- to

*have patients come to them.  A doctor
would see them at that clinic.  In the
normal course, the doctor would see them
at the clinic, then refer most of the
patients for physical therapy,
acupuncture and chiropractic treatment.*

*Within that brick and mortar building
would be a chiropractor, an acupuncturist
and physical therapist, okay. But often
the physical therapy was billed through
the clinic.*

*But the chiropractic treatment and the
acupuncture treatment were separate PCs
that worked out of that clinic and would
receive patient referrals from the no
fault clinic.  And in return for getting
a steady stream of business, because it
was a volume business from the no fault
clinic, they would pay kickbacks.  Now it
would either be per patient. In some
cases it would be ten or $12 per patient
that was referred, and in other cases it
was this sort of profit sharing
arrangement of 60 percent, 40 percent.
But based on our investigation, every
single clinic, every single chiropractor
clinic and acupuncture clinic that would
have space in the no fault clinics would
pay money back to the no fault clinic
controllers, okay.  So it was part and
parcel of the scheme.*

****

*MR.GOLDMAN: And so it is the Government's
view that it is important to sentence Mr.
Poznansky, who is not an extraordinary
case, in fact he's already been credited
with a minor role factored into his*

*guideline range, and a sentence of 18 to
24 months would be very appropriate in
this case.*

\*       \*       \*

The Court took a five minute recess and
returned with his decision:

*THE COURT: This particular defendant is
not being held responsible for the
entirety of the scheme, but for one
particular aspect of it.  And it involved
billing for services that were not
provided over the course of three years;
essentially, a fairly long period of
time, and he knew what he was doing and
he should have known better.*

\*       \*       \*

*Mr. Poznansky was someone who did the
improper billing of the insurance
companies in his case by charging for
acupuncture services that were never
actually performed and in significant
amounts when you add them up. It's also
important to note a difference with the
defendant Dr. Greensher is that he wasn't
just sort of a cog in the machine.  He
incorporated the clinic and was receiving
the benefit of his billings, even if it
was after taking out the overhead that he
had to run the clinic.  He was the sole
shareholder in the clinic that was doing
the billing, and in that sense he had a
larger role than Dr. Greensher, although
he was a minor participant in the overall
scheme.*

\*       \*       \*

> *Having said that, I do believe that the 18 to 24 month period in the guidelines, given his minor role and the other characteristics I've mentioned, would be too high.  I believe something higher than Mr. Greensher is appropriate, and, therefore, I believe that a sentence of nine months incarceration is appropriate considering all these factors.*

Dmitry also has those "other characteristics." He is married, has a closely-knit family, is a devoted father, a devoted son whose parents live in the same apartment building and has no prior record.

Dmitry, moreover, fully accepts responsibility for his crimes and is relieved that "it is all over."  He has made it a teaching moment for his children. He has told them that besides being punished for stepping outside of the law what they should keep in mind is that committing crimes put families at risk-- people who have done nothing wrong. Gabriel is 14, Odele is 8, and Avital is 5.

As a person Dmitry is personable and good-natured. He looks forward to the day he can start anew. His chiropractic days are a thing of the past. His father dabbles in the construction business and he does as well so he will have employment opportunities when he is released. Pictures and letters will be forthcoming as they are received. As times is of some essence this memo is being submitted without them.

One last consideration that should be mentioned for the Court's consideration is the timeliness of Dmitry's plea. Dmitry was the fourth person out of the 38 defendants to plead guilty. He did so February 14, 2013. For almost a year, no one, with the exception of three others who had entered their pleas close to the time Dmitry did, had entered a plea of guilty. After he and the other three pled, a flurry of pleas were entered by other defendants that, we submit, was no coincidence and causal in nature.  Under Second Circuit

Guideline case law breaking up a "log jam" is a valid basis to depart from the adjusted offense level guideline. <u>U.S. v. Garcia,</u> 926 F.2d 125(2d Cir. 1991) While we are not and cannot ask for a guideline departure we believe it is an appropriate consideration under 18 U.S.C. 3553(a).

Respectfully submitted,

David Zapp

Cc: AUSA Daniel Goldman